T.C. Memo. 1997-461


UNITED STATES TAX COURT


ESTATE OF PAUL MITCHELL, DECEASED, PATRICK T. FUJIEKI, EXECUTOR,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21805-93.                    Filed October 9, 1997.


David W.K. Wong, B. John Williams, Jr., Miriam Louise Fisher,
Karen L. Hirsh, and Melvin E. Lefkowitz, for petitioner.

Henry E. O'Neill, Alan Summers, and Paul G. Robeck, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent determined a $45,117,089 Federal
estate tax deficiency, an $8,396,020 penalty under section 6662(g),
and a $147,623 penalty under section 6662(h). After concessions,

the issues remaining for decision are: (1) The moment-of-death value of 1,226 shares of John Paul Mitchell Systems common stock; and (2) whether petitioner is liable for the section 6662(g) penalty.[1]

All section references are to the Internal Revenue Code as amended and in effect at decedent's date of death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts, stipulations of settled issues, and attached exhibits are incorporated herein by this reference.

A. Background

Paul Mitchell (Mr. Mitchell or decedent) was a resident of Hawaii when he died on April 21, 1989. Patrick T. Fujieki is the executor of the Estate of Paul Mitchell. Mr. Fujieki resided in Honolulu, Hawaii, at the time the petition in this case was filed.

Among the assets included in Mr. Mitchell's taxable estate were 1,226 shares of John Paul Mitchell Systems common stock held by the Paul Mitchell Trust (the Trust), a revocable trust

---

[1] On June 11, 1996, petitioner filed a Motion to Shift the Burden of Persuasion. By Order dated July 8, 1996, we denied petitioner's motion. On brief, petitioner again raised this issue. We reaffirm our conclusions as stated in our July 8, 1996, Order. But even assuming arguendo we would have granted petitioner's motion, our valuation of the stock at issue would not be altered.

established by Mr. Mitchell.  It is the value of these shares at the moment of Mr. Mitchell's death that we must determine.[2]

B.  Paul Mitchell

Paul Mitchell was born Cyril Thomson Mitchell in Scotland on January 27, 1936.  His mother was a hairdresser.  At the age of 16, he enrolled in beauty school, and after a 5-year apprenticeship, he became a "qualified hairdresser".  Thereafter, Mr. Mitchell worked in four salons and won several competitive hair contests in England.

In the early 1960's, Mr. Mitchell pursued fashion hair styling working with Vidal Sassoon and became one of London's best known hair stylists.  When Mr. Sassoon opened his first U.S. salon, he chose Mr. Mitchell to train the staff.  While employed with Vidal Sassoon, Mr. Mitchell brought to the United States the "blow dry" look.

In 1966, Mr. Mitchell left Mr. Sassoon and became director of Bendel's Beauty Floor at Henri Bendel's in New York City.  While he was at Bendel's, his work was featured on the covers and pages of major fashion magazines. He became known as the "haircutter's haircutter".

In 1967, Mr. Mitchell and other investors opened Crimpers Salon, a successful high-fashion cutting salon, in New York City.

---

[2]     We believe the moment-of-death valuation is appropriate in this case due to the importance of Mr. Mitchell to, and the impact of his death on, John Paul Mitchell Systems.

Other Crimpers Salons subsequently opened in Boston, Chicago, Dallas, and Philadelphia. In 1971, Mr. Mitchell sold his share in Crimpers and spent a year away from the hair styling industry.

In 1972, Mr. Mitchell returned to the hair styling industry, opening the Superhair Salon in New York City, a high-fashion salon and cutting school. Several years later, he moved to Hawaii. His reputation as a master stylist continued, and he was invited to perform as a guest platform artist at professional beauty shows throughout the United States.

While demonstrating his techniques at professional beauty shows, Mr. Mitchell developed the "sculpted look" of hair styling. This new look started with an excellent cut. A product was introduced by Mr. Mitchell that gave the cut greater versatility, permitting the setting of hair without rollers or a curling iron. Mr. Mitchell's product, called "liquid styling tool", was a gel-like liquid that set hair in the shape into which it was combed. Mr. Mitchell's product line was marketed in orange and white bottles and sold only at the hair shows where Mr. Mitchell demonstrated his hair styling techniques. Mr. Mitchell's initial efforts to market his product line proved unsuccessful.

C. The Hair Care Industry

The hair care products industry is segmented by distribution channels. "Mass market" products are sold directly to consumers through major retail outlets, such as supermarkets, drugstores, and

discount stores. Products sold through this distribution channel are heavily dependent upon extensive and expensive mass-media advertising to generate an awareness of the product and consumer demands. "Over-the-counter" products are sold through beauty supply stores, which sell products that are not "salon-only" products (and are generally not available in the mass market). "Salon-only" (or "professional-only") products (such as the Paul Mitchell line described hereinafter) are available to the public only through professional hair salons. Throughout the 1980's, the greatest growth in sales of hair care products was in the salon-only market.

Salon-only products do not require a high level of advertising expenditures, but they are heavily dependent upon the recommendation of a brand, product, or system, by the hair stylist to the consumer in the salon. Because of the hair stylist's ability to influence the consumer, companies that sell their products through salons emphasize marketing to hair stylists and salon owners. Furthermore, these companies place importance on educating hair stylists and salon owners about their products in order to ensure correct recommendations to consumers, which in turn increase the possibility of repeat sales.

The professional hair care industry is trendy and fashion oriented and sells the public on changes in looks. Hair stylists learn the latest trends and fashions through trade magazines (such as Modern Salon, Salon Today, American Salon, and Salon News).

Growth in sales for a professional hair care company depends upon maintaining a forward edge in fashion and trends.[3]

There are three categories of liquid hair products: "Hair care" (shampoos, conditioners, and rinses); "styling products" (hair sprays, fixatives, mousses, sculpture lotions, etc.); and "chemical reactive products" (hair color, perms, and bleaches).

Professional-only hair care products are marketed on an implied promise to the hair stylists that such products will not be mass marketed or sold through drugstores, supermarkets, or discount stores. Professional hair stylists will not sell or use mass-marketed products in their salons. Mass marketing a product closes the salon or professional market to that product.[4]

Education is an important aspect of marketing hair care products to hair stylists. This education includes hair shows, product knowledge classes, and styling classes (featuring new ways to cut hair and new products to achieve the latest looks). During hair shows, platform artists demonstrate new styles and techniques,

---

[3] For instance, Redken was a professional hair care company that dominated the salon-only market through the 1970's. In the early 1980's, Mr. Mitchell began to convince hair stylists that the new trend in styling was the "sculpted look". Redken's sales growth flattened when it did not keep abreast of this trend.

[4] During the 1960's and 1970's, companies such as Wella Balsam, Aqua Net, Vidal Sassoon, and Jhirmack broke the implied promise and changed their distribution from salon-only to the mass market. The products of each of these companies were closed out of the professional market shortly after being mass marketed.

using the promoted products. Hair shows occur at the international, national, regional, and local levels.

Hair care industry market revenues grew to $4.2 billion in 1988. During that year, shampoo sales rose by 4 percent, conditioner sales rose by 9 percent, and styling products sales rose by 30.7 percent. Hair sprays and hair styling products were growing at double-digit rates.

D.  The Creation of John Paul Mitchell Systems

John Paul "Jones" DeJoria grew up in Los Angeles. Following his graduation from high school, he enlisted in the Navy. Upon his discharge therefrom, he had a variety of sales jobs, selling products such as encyclopedias, photocopiers, insurance, and magazines. In the early 1970's, Mr. DeJoria began working in the beauty products industry for Redken. He held several positions including field sales representative, district manager (Texas), and national chain and salon manager. While employed at Redken, Mr. DeJoria gained extensive experience in the sale, marketing, promotion, and distribution of beauty products. He possessed exceptional organizational, managerial, and marketing skills.

Messrs. Mitchell and DeJoria first met in the early 1970's. They eventually developed a close friendship. In 1979, they joined forces to market Mr. Mitchell's hair care products (particularly the sculpting lotion) through professional-only hair salons. Mr. DeJoria believed he could successfully market the line. Initially,

Messrs. Mitchell and DeJoria were unable to find anyone willing to provide financial assistance; thus, they pooled their resources of $700 to purchase an answering machine, bottles, and caps and hire an artist to design a logo for their labels. Mr. DeJoria persuaded a cosmetics laboratory to manufacture the first batch of products on credit. Instead of the orange and white bottles Mr. Mitchell had previously used, these products were packaged in white bottles with Paul Mitchell's name displayed in black lettering down the side.

At all relevant times, Paul Mitchell products were sold to the public only through professional hair salons.

## 1. Structure and Ownership

On March 31, 1980, Messrs. Mitchell and DeJoria formed Paul Mitchell Systems, Inc. On May 9, 1985, the corporation changed its name to John Paul Mitchell Systems (JPMS). Messrs. Mitchell and DeJoria granted JPMS all proprietary and distribution rights to the hair and skin products that Mr. Mitchell developed (or had developed under his direction), including the products' trademark, service mark, or other intellectual property rights.

JPMS' articles of incorporation authorized the issuance of 10,000 shares of common stock. Between March 31, 1980, and April 21, 1989 (the date of Mr. Mitchell's death), JPMS had 2,500 shares issued and outstanding. Article VII of JPMS' bylaws provided that any transfer of JPMS stock was subject to a right of first refusal,

exercisable first by the corporation, then by each nontransferring shareholder.

Initially, Mr. DeJoria owned 1,250 shares of JPMS common stock and Paul Mitchell Associates, Ltd. (PMA), owned 1,250 shares. Mr. Mitchell owned all of PMA. On February 20, 1982, PMA assigned its JPMS shares to Mr. Mitchell. On November 20, 1984, Mr. Mitchell assigned his JPMS shares to the Trust. On August 1, 1987, Mr. Mitchell, acting as trustee of the Trust, assigned 16 shares of JPMS common stock to Jeanne Braa, his long-time stage partner in hair shows, and 8 shares of JPMS common stock to Angus Mitchell, his son. Mr. DeJoria and JPMS executed written waivers of the right of first refusal with respect to all of these transfers.

As of April 21, 1989, the common stock of JPMS was owned as follows:

|  | Number of Shares | Percent |
| --- | --- | --- |
| Mr. DeJoria | 1,250 | 50.00 |
| The Trust | 1,226 | 49.04 |
| Ms. Braa | 16 | 0.64 |
| Angus Mitchell | 8 | 0.32 |
| Total | 2,500 | 100.00 |

JPMS' bylaws provided for a board of directors (the Board) consisting of four directors. However, from 1984 until April 15, 1989, Mr. Mitchell, Mr. DeJoria, and Peter Langenberg were the only Board members. On April 15, 1989, Mr. Langenberg resigned and Ms. Braa was elected to replace him.

From 1984 until April 1989 Mr. Mitchell served as president of JPMS; Mr. DeJoria served as chairman of the Board, chief executive officer, chief financial officer, and secretary.

As of April 21, 1989, the stock in JPMS had not been registered under any securities law; moreover, neither Mr. DeJoria nor Mr. Mitchell had ever contemplated such a registration or a public offering of JPMS' common stock.

2. Products

JPMS debuted its products at the West Coast Beauty Supply Spring Style show in 1980, with Mr. Mitchell demonstrating the product line. JPMS sold the entire first batch of its products at the show, generating revenue of approximately $10,000.

That same year, JPMS began selling Paul Mitchell products through distributors. At the time, the product line consisted of "Shampoo One", "Shampoo Two", "The Conditioner", and "Hair Sculpting Lotion". The new hair sculpting lotion and sculpted look were well received in the market. Messrs. Mitchell and DeJoria began promoting JPMS products as a "system" of products to be used in conjunction with each other to achieve "the look".

At the time of Mr. Mitchell's death, JPMS sold the following products, which were formulated by independent chemists:

| | |
|---|---|
| Shampoo products | Shampoo One; Shampoo Two; Awapuhi Shampoo; Tea Tree Special Shampoo |
| Hair conditioning products | The Conditioner; Super-Charged Conditioner; Hair Repair Treatment |

| Hair setting and styling products | Hair Sculpting Lotion; The Spray; Fast Drying Sculpting Spray; Freeze and Shine Super Spray; Super Clean Gel; Sculpting Foam; Super Clean Spray |
|---|---|
| Permanent wave products | The Solution; Special Perm Neutralizer; Awapuhi Conditioning (Box) Perm |

### 3. Marketing and Distribution

JPMS' marketing effort primarily targeted, and the distribution network was primarily oriented toward, hair stylists and salon owners who sold hair care products to their customers, rather than direct marketing to the consumers themselves. Mr. Mitchell's popularity and reputation with hair stylists were used to introduce JPMS' products, and the hair shows were used to increase the visibility of JPMS and its products.

JPMS' marketing strategy included the use of distributors to promote its products. As of April 21, 1989, JPMS had 38 distributors in the United States and 13 distributors in 12 other countries. Nearly all of the distributors had an exclusive geographic territory. The distribution network was generally composed of friends of Messrs. Mitchell and DeJoria who believed that Mr. Mitchell's reputation as an avant-garde hair stylist, and Mr. DeJoria's business background, would sell the JPMS products. As of April 21, 1989, JPMS had no written agreements with its U.S. distributors.

Mr. DeJoria's organizational and marketing skills, combined with Mr. Mitchell's artistic creativity and expertise, allowed JPMS

to create a successful and effective product line. The JPMS products were marketed only to salons and emphasized education as a selling technique.

E.  Mr. Mitchell's Role in JPMS

In 1980, Mr. Mitchell promised hair stylists that his products, marketed through JPMS (then Paul Mitchell Systems, Inc.), would be sold only through professional salons. Mr. Mitchell's promise carried credibility due to his stature in the professional beauty industry. The promise to remain "professional-only" was important to the successful marketing of the Paul Mitchell products.

Mr. Mitchell was the heart of JPMS' connection to hair stylists, who were the foundation for JPMS' marketing strategy of promoting and selling products that Mr. Mitchell developed. Mr. Mitchell was JPMS' creative trendsetter, and his hair sculpting technique revolutionized hair styling.

In order to further promote its products, JPMS developed the "Associates Program" to train hair stylists in the Paul Mitchell system. This program became an integral part of JPMS' marketing effort. JPMS associates underwent special training in both hair styling and JPMS products. Once trained, the associates went to salons to teach the proper techniques to promote the products.

By April 21, 1989, JPMS had 700 associates. The associates were paid by the distributors, and they were involved with JPMS

because they sought professional advancement and financial rewards. The associates program played a large part in JPMS' success.

Mr. Mitchell was a popular "draw" at industry hair shows, performing on a regular basis from 1980 until July 1988. During the show season, Mr. Mitchell, along with his stage partner, Jeanne Braa, would travel to as many as four cities a week for approximately 3 months at a time. This included shows for each distributor as well as demonstrations through in-salon classes. Mr. Mitchell traveled with distributors' salesmen who assisted in the introduction and sale of JPMS products.

Mr. Mitchell was the focal point of JPMS' advertising campaign. In 1986, JPMS came up with the "Creative" concept campaign, putting Mr. Mitchell literally behind the product, using photographs of him taken by Irving Penn, a noted fashion photographer. This campaign, which ran through 1987, was bifurcated into a consumer version for Vogue, Mademoiselle, and Glamour magazines with the caption "Can you say 'Paul Mitchell does my hair?'", as well as a trade version for Modern Salon and American Salon magazines with the caption "Paul Mitchell works for me". A similar 1988 advertising campaign also featured Mr. Mitchell.

## F. Mr. Mitchell's Illness and Death

Mr. Mitchell's health had been good until approximately May 1988, when he returned from a series of hair shows in Japan and

began to experience loss of appetite, weight loss, and the onset of jaundice. On July 18, 1988, he was admitted to Cedars Sinai Hospital in Los Angeles and was diagnosed as having pancreatic cancer. Four days later his pancreas, spleen, gall bladder, and a portion of his stomach were surgically removed. He remained in the hospital until September 30, 1988, undergoing additional surgeries and medical procedures, including radiation therapy. Upon release, he returned to his home in Hawaii, where he had full-time private duty nursing. Throughout this period, Mr. Mitchell continued his roles as the JPMS creative force, company spokesman, and executive.

Following his hospitalization, Mr. Mitchell was required to take insulin to control diabetes. In October and November 1988, he consulted with and received treatment from doctors in Hawaii, Los Angeles, and New York. Although he continued experiencing bouts of nausea, his medical condition improved, and he gained weight. Mr. Mitchell began receiving acupuncture treatments, keeping his medication intake at a minimum. Although follow-up tests revealed no evidence of metastasis, a November 1988 blood test raised a possibility of a recurrence of cancer but was inconclusive.

Mr. Mitchell's medical condition prevented him from working or performing at hair shows until approximately January 1989, when he performed at a hair styling show in New York City and participated in the JPMS distributors meeting in Vail, Colorado. During this time, he also continued his role in product development, meeting

with an independent chemist regarding his ideas for future products.  In February 1989, tests revealed a recurrence of cancer. Physicians in Hawaii encouraged Mr. Mitchell to begin chemotherapy, but he refused.

Mr. DeJoria avoided disclosing the severity of Mr. Mitchell's illness to quell any fears about the uncertainty of JPMS' future without Mr. Mitchell. Upon Mr. DeJoria's instruction, Mr. Mitchell's illness was portrayed as bacterial food poisoning. Rumors circulated that Mr. Mitchell was suffering from AIDS or cancer.

To a degree, the 1989 advertising campaign (which was shot in November or December 1988) still focused on Mr. Mitchell.  However, Mr. DeJoria and JPMS began shifting emphasis away from Mr. Mitchell as an individual and towards the products themselves.  In fact, one campaign attempted to focus on Mr. DeJoria, featuring him and his daughter in an advertising campaign for "Baby Don't Cry" shampoo.

After performing at the West Coast Beauty show in San Francisco in March 1989, Mr. Mitchell returned to Honolulu, where he visited physicians.  Later that month he traveled to Mexico to begin receiving laetrile treatments.  He remained in Mexico until his return to Cedars Sinai Hospital, where he died on April 21, 1989, at the age of 53.  The cause of death was listed as liver failure due to liver and pancreatic cancer.  As of the time of his

death, the public at large was generally unaware of who Paul Mitchell was or that he had died.

Following Mr. Mitchell's death, the hair care industry widely perceived that JPMS had lost its creative and artistic leader. Rumors about JPMS becoming a mass marketer resurfaced, and there was uncertainty whether JPMS would become just another company. Distributors (both exclusively JPMS and multiline) feared that the loss of Paul Mitchell's creative force would at least slow product sales. However, they did not consider dropping the JPMS product line, primarily because of its profitability.

G. JPMS' Operations and Management

As of April 21, 1989, JPMS had some 50 employees, approximately 21 of whom worked in a 90,000-square-foot warehouse space, with an additional 10,000 square feet of office space, in Santa Clarita, California, owned by Mr. DeJoria and the Trust as tenants in common and leased by JPMS. As of April 21, 1989, the warehouse space was not in compliance with the local fire code and had no environmental controls for drainage of waste or runoff water in the event of fire or disposal of poor-quality product. (Some materials used to make hair care products are categorized as hazardous waste.)

JPMS had no useful inventory controls. By April 21, 1989, the warehouse was in disarray, and there was a several-months' supply of products stacked up in JPMS' parking lot. In fact, JPMS tracked

its sales by manually recording them on a blackboard.  None of the JPMS staff knew how to use computers.

As of April 21, 1989, JPMS' products were formulated by independent chemists and manufactured at independent laboratories.[5] JPMS did not have the formulas for many of its products.  Relying on unrelated contract manufacturers to supply the products prior to Mr. Mitchell's death, JPMS generally had no confidentiality agreements with the contract manufacturers covering the proprietary nature of the formulas.

Prior to Mr. Mitchell's death, JPMS was managed as a partnership wherein each partner had a unique role.  Mr. Mitchell's strength was his artistry, creativity, and relationship with hair stylists, and JPMS relied on his foresight and artistry to develop products.  Mr. DeJoria's strength was in sales, distribution, and promotion.

Mr. DeJoria ran the daily operations at JPMS, making all management decisions and having all managers reporting directly to him (because JPMS had no middle management).  Mr. Mitchell, however, was the "senior partner", having the last word on all

---

[5]    From September 1983 through August 1988, Star Laboratories of California (Star), an independent contract manufacturer, produced most of JPMS' products.  In August 1988, JPMS' relationship with Star ended, and JPMS' manufacturing was switched to Sun Laboratories (Sun).  JPMS' relationship with Sun was terminated in April 1989; thereafter, JPMS' manufacturer became Bocchi Laboratories, a corporation in which Mr. DeJoria was a 50-percent owner.

policy matters.  Following  Mr. Mitchell's death, Mr. DeJoria became critical to JPMS' future.

## H.  JPMS' Position in the Industry

JPMS was known for its styling products.  Over the years, JPMS developed into a major force in the hair care industry, with brand recognition by the consuming public, a sophisticated distribution network, and hundreds of hair stylists trained in the use of the company's products.  From 1982 through April 21, 1989, JPMS' share of the salon-only market, in comparison with those of its chief competitors, improved every year.  In April 1989, JPMS was among the top five companies in the salon-only market.  The success of the salon-only product companies attracted the attention of the large, well-capitalized mass-market companies, which competed in the premium-price market with products that attempted to capture the salon-only aura but were in reality mass marketed.

## I.  Compensation

From JPMS' inception until Paul Mitchell's death, neither  Mr. Mitchell  nor  Mr. DeJoria  had  any  formal  contract  with  JPMS regarding compensation.  Instead, they set sales and profitability goals for JPMS at the beginning of each fiscal year.  Thereafter, in September or October of each year, they divided equally the company's available income.

For fiscal years ended July 31, 1984 through 1988, Messrs. Mitchell and DeJoria each received the following payments from JPMS:

| For Year Ended | Salary | Management Fees | Total |
|---|---|---|---|
| 7/31/84 | --- | --- | [1]$1,086,500 |
| 7/31/85 | --- | --- | [1]2,305,000 |
| 7/31/86 | --- | --- | [1]4,162,525 |
| 7/31/87 | $185,125 | $8,565,000 | 8,750,125 |
| 7/31/88 | 1,308,000 | 10,500,000 | 11,808,000 |

[1] Payments to Messrs. Mitchell and DeJoria for this year were not broken down into salary or management fees.

JPMS characterized these payments as compensation for services rendered.

Between August 1, 1988, and April 21, 1989, JPMS paid Mr. Mitchell $10,758,046 (which JPMS characterized as compensation for services rendered). For fiscal year 1989, Messrs. Mitchell and DeJoria agreed that each of them would receive a $2 million annual salary and a $15 million management fee.  The JPMS Board approved these compensation amounts on October 21, 1988.

From the inception of JPMS until the moment of Mr. Mitchell's death, the only dividend declared by JPMS was for its fiscal year ended July 31, 1988. The dividend was originally set at $1.4 million but was subsequently raised to $2.5 million.

During the latter part of Mr. Mitchell's illness, Messrs. DeJoria and Mitchell discussed Mr. DeJoria's future compensation. Mr. DeJoria promised Mr. Mitchell that in the event of Mr. Mitchell's death, he would reduce his management fee from $15

million to $10 million for JPMS' fiscal year ending July 31, 1990. Mr. DeJoria's $2 million salary for that year was to remain intact.

J.  Discussions and Agreement With Gillette

In 1987, the Gillette Co. (Gillette) was interested in entering the salon-only (or professional-only) products segment of the hair care market.  JPMS was one of the primary candidates that Gillette considered purchasing.

In the fall of 1987, Gillette and Messrs. DeJoria and Mitchell discussed a potential joint venture between Gillette and JPMS to distribute a Gillette permanent wave product through the JPMS distribution system.  Gillette also sought an option to purchase JPMS, but Messrs. DeJoria and Mitchell would agree only to grant Gillette a right of first refusal.

Accordingly, on December 18, 1987, Aapri Cosmetics, Inc., a wholly owned subsidiary of Gillette, and JPMS entered a joint venture, which began on January 1, 1988, and was to last for an initial 2-year period.  The joint venture agreement provided Gillette with a right of first refusal to purchase JPMS at a formula price of 10 times JPMS' prior 12 months' operating income, after deducting the maximum Federal and State corporate income taxes (assumed to be 50 percent of income), and excluding from JPMS' operating income officers' salaries and car expenses.  Until July 1988, the price payable pursuant to the right of first refusal was capped at $150 million. Gillette's ultimate goal in entering

into the joint venture was to acquire JPMS; Gillette had no interest in a minority shareholder position.

Gillette neither exercised nor waived its right to exercise its right of first refusal contained in the joint venture agreement. During the pendency of the joint venture, Gillette received no notification concerning any offers by third parties to purchase the stock or assets of JPMS.

Only Gillette's board of directors could approve an acquisition the size of JPMS. No formal proposal was ever made to Gillette's board of directors to approve the acquisition of JPMS.[6]

The permanent wave product marketed through the joint venture agreement was not well received in the salon market. The joint venture lost $1 million in the first 2 years and was unsuccessful. Accordingly, the joint venture agreement was terminated in December 1989.

---

[6] According to Mr. DeJoria, a Gillette representative orally proposed the acquisition of JPMS for $150 million and a 1-percent royalty payment to each of Messrs. Mitchell and DeJoria. Mr. DeJoria responded that he thought JPMS was worth more. However, Roland L. Loper, Gillette's vice president and controller of the personal care division from 1987 through 1988, and vice president for finance and strategic planning of the personal care group in 1989, insisted that no such offer was made.

K.  Sale Discussions With Minnetonka

Another suitor of JPMS was Minnetonka Corp. (Minnetonka), a publicly traded company.  Robert Taylor was Minnetonka's president and chief executive officer.  Mr. Taylor co-founded Minnetonka in 1961 and took the company public in 1968.

Minnetonka was involved in consumer product brands, primarily those that were sold through the department store, gift, or beauty trade.  Minnetonka was the licensee for Calvin Klein and created Obsession and Eternity women's fragrances.  In addition, Minnetonka created Foltene, a treatment used in the beauty salon business for fine and thinning hair, a product line for home fragrance, and a gift soap product line for department stores.

In 1990, Mr. Taylor started a salon-only hair products company, Graham Webb International, which grew to $25 million in sales in 5 years. From 1992 or 1993 to approximately 1995, Mr. Taylor was on the board of directors of Banker's Trust Venture Capital Fund in New York (Bankers Trust), which specializes in providing funds for small businesses or recapitalization funds.[7]

---

[7]     Bankers Trust had $200 million to invest in recapitalizations or buyouts that it used primarily for companies in the $5 million to $100 million range.  During his tenure with Bankers Trust, Mr. Taylor reviewed approximately 100 proposals for the use of this money.

As chairman, Mr. Taylor was responsible for Minnetonka's strategic acquisitions.[8] In 1985, when JPMS' sales approximated $10 million, a financial adviser to JPMS solicited Mr. Taylor's interest in acquiring JPMS. However, Minnetonka determined that JPMS was too small and that the Paul Mitchell brand name was not strong enough to stand on its own; accordingly, Mr. Taylor declined to enter discussions at that time.

Two years later, Minnetonka targeted the salon industry for acquisition candidates, and Mr. Taylor contacted Redken, Sebastian, and JPMS. During this time, the annual sales of these companies were approximately $120 million, $60 million, and $50 million, respectively. Although Minnetonka agreed to acquire Sebastian for $100 million in late 1987, the sale was not consummated.

Mr. Taylor initiated discussions with Mr. DeJoria in the fall of 1987 (JPMS' 1988 fiscal year) when JPMS' sales were approximately $50 million. Mr. Taylor informed Mr. DeJoria that

---

[8] Mr. Taylor was involved in the August 1987 sale of Minnetonka's liquid soap business to Colgate-Palmolive Co. for $60 million, the November 1988 acquisition of the Vitabath business from Quintessence for $38 million, and the July 1989 sale of Minnetonka to Unilever for $376 million at approximately two times sales. When the Unilever acquisition was announced the price of Minnetonka stock was at $14 per share, and the transaction was consummated at $22.50 a share, a 60-percent premium over the freely traded value.

Mr. Taylor used two "rules of thumb" with regard to the valuation of a company under consideration for acquisition: two times sales and/or five times operating income. Mr. Taylor measured these rules against other standards, such as potential for future growth, quality of management, capital requirements, and strength of brand name.

Minnetonka was willing to pay $100 million to acquire all of the JPMS stock, assuming officers' salaries were revised.[9]  Mr. DeJoria insisted on a $125 million acquisition price.  Mr. Taylor refused to raise Minnetonka's bid, and the negotiations were terminated.

In the fall of 1988, Mr. Taylor again approached Messrs. DeJoria and Mitchell.  (At the time, JPMS' sales were in the $65 million range.)  Mr. Taylor offered $125 million[10] to acquire all of the JPMS stock. (At this time, Mr. Taylor was unaware that Mr. Mitchell was seriously ill.)  The proposed acquisition price assumed that: (1) Mr. DeJoria would continue managing JPMS; (2) Mr. Mitchell would continue promoting the products for at least 18 months to 2 years as a transition period; and (3) both Messrs. Mitchell and DeJoria would be compensated in salary and stock at a level paid to officers of other Minnetonka subsidiaries, such as Calvin Klein.

Mr. DeJoria did not accept Minnetonka's $125 million offer; he believed that Minnetonka was "just a little short every time".  (Mr. DeJoria represented to Mr. Taylor that he had received from

---

[9]     Minnetonka would not have been interested in purchasing a 49-percent interest in JPMS.
     Mr. Taylor regarded the level of compensation for Messrs. Mitchell and DeJoria as too high; he considered a more appropriate level of compensation to be in the $500,000 to $1 million range, including performance bonuses.

[10]     In determining the value of JPMS, Mr. Taylor considered the company's growth potential.  In the fall of 1988, he thought that JPMS could perhaps double or triple in size within 5 years.

Gillette a $150 million offer plus a royalty of 2 percent of sales for lifetime. Mr. Taylor informed Mr. DeJoria that he could not match Gillette's offer.) Sales discussions with Minnetonka thus ended.

L. Financial Information Available at Date of Death

JPMS adopted a fiscal year ending July 31. Beginning with the fiscal year ended July 31, 1984, the shareholders elected subchapter S status for Federal income tax purposes. JPMS remained a subchapter C corporation for State of California income tax purposes until the 1988 fiscal year, when the shareholders elected subchapter S status for California.

KPMG Peat Marwick (KPMG) (or one of its predecessors) certified JPMS' audited financial statements. JPMS' net sales and net income after taxes for fiscal years ended July 31, 1982 through 1988, inclusive, were as follows:

| Fiscal Year Ended 7/31 | Net Sales | Net Income After Taxes |
|---|---|---|
| 1982 | $1,369,316 | $142,375 |
| 1983 | 3,590,641 | 159,947 |
| 1984 | 5,349,152 | 4,004 |
| 1985 | [1]11,266,610 | 207,777 |
| 1986 | 24,131,739 | 2,265,875 |
| 1987 | 41,371,318 | 281,777 |
| 1988 | 60,693,857 | 2,569,297 |

[1] The audited financial statements for the years ended July 31, 1986 and 1985, state this amount as $10,918,252.

At Mr. Mitchell's death, the most recent available certified financial statements were for JPMS' fiscal year ended July 31,

1988. The most recent interim financial statements available were for the 6 months ended January 31, 1989. (In addition to the annual audited financial statements, KPMG also prepared unaudited financial statements on a quarterly basis.)

Except for motivational sales goals announced at semiannual distributors meetings as of April 21, 1989, JPMS did not project future revenues, expenses, costs of maintaining the Paul Mitchell brand name, or income. Between December 1989 and January 1990 KPMG prepared projections of JPMS' revenues and expenses for fiscal years 1990-94.

M. Post-Death Events

1. Mr. Fujieki's Request for JPMS Documents

On June 29, 1989, Patrick Fujieki, trustee of the Trust, and Michaeline Re[11] were elected to the JPMS Board. (The Board was thus comprised of Mr. DeJoria, Ms. Braa, Mr. Fujieki, and Ms. Re.) At this time, the Trust was the shareholder of record of 49.04 percent of the outstanding common shares of JPMS, of which 1 percent was to be transferred to Mr. DeJoria in accordance with the terms of Mr. Mitchell's Will and Trust.

Mr. Fujieki (in his capacities as director of JPMS, trustee for the Trust, and executor of Paul Mitchell's estate) asked to

---

[11] Ms. Re, an attorney, joined JPMS on Jan. 1, 1989, as vice president and general counsel, to oversee the correction of certain operational problems. On Mar. 1, 1989, she became JPMS' chief operating officer.

inspect the JPMS corporate records and financial information at the June 29, 1989, JPMS Board meeting and in later correspondence with Ms. Re, Mr. DeJoria, and other JPMS employees. Through December 19, 1989, Mr. Fujieki was not provided with financial statements for the JPMS fiscal year ended July 31, 1989. On April 10, 1992, representatives of Mr. Fujieki were permitted to review JPMS' financial records but were not allowed to make copies. Before permitting Mr. Fujieki's representatives to review its financial records, JPMS required Mr. Fujieki and his representatives to execute confidentiality agreements.

Mr. Fujieki continually questioned the actions of the JPMS Board at its meetings and the accuracy of the corporate minutes. Beginning July 30, 1992, through at least April 20, 1993, James Ukropina, Esq., outside legal counsel for JPMS, attended the JPMS Board meetings.

### 2. Purchase Offer From Mr. DeJoria

On April 21, 1989, JPMS faced losing its subchapter S status when the Trust ceased to qualify as a subchapter S shareholder. Maintaining JPMS' subchapter S status would have been beneficial to its shareholders because no corporate-level tax would be imposed on JPMS' income. One option would have been for Mr. DeJoria to purchase the Trust's shares of JPMS; however, Mr. DeJoria refused to consider this option because it would have gone against Mr. Mitchell's wishes of providing for his son Angus, for which reason

the Trust had been created.  Gregg Ritchie, an accountant with KPMG who oversaw the preparation of JPMS' annual audited financial statements, began to explore various scenarios for maintaining JPMS' subchapter S status.

On April 4, 1991, Mr. DeJoria offered, through Mr. Ritchie, to purchase the Trust's share of JPMS common stock for $47 million. Mr. DeJoria's offer included $4.7 million in cash on April 15, 1991, with the balance in 10 annual installments of $4.23 million commencing April 15, 1992 (the unpaid principal balance would bear interest at 8 percent per year, payable quarterly).  On April 10, 1991, Mr. Fujieki rejected the offer.  Mr. Fujieki invited Mr. DeJoria to make a higher bid; Mr. DeJoria refused, indicating that his next offer would be $37 million ($10 million less than his April 4, 1991, offer).

### 3.  Compensation Dispute

Mr. DeJoria assumed many of Mr. Mitchell's corporate responsibilities following Mr. Mitchell's death.  Between April 22 and July 31, 1989, JPMS paid Mr. DeJoria $4,901,537 as compensation for services rendered to JPMS.  For JPMS' fiscal year ended July 31, 1990, Mr. DeJoria agreed to reduce his management fee from $15 million to $10 million, as promised to Mr. Mitchell.  Mr. DeJoria also received $2 million in salary for that year.  In summary, JPMS paid Mr. DeJoria the following amounts for fiscal years ended July 31, 1990 through 1994:

| For Year Ended | Amount |
|:---:|:---:|
| 7/31/90 | $12,000,000 |
| 7/31/91 | 17,025,000 |
| 7/31/92 | 17,025,568 |
| 7/31/93 | 17,000,000 |
| 7/31/94 | 17,000,000 |

JPMS characterized these payments as compensation for services rendered.

From August 1, 1989 through 1992, Mr. Fujieki repeatedly requested in letters and at Board meetings that the Board retain an independent compensation consultant to consider the reasonableness of Mr. DeJoria's compensation.  The Board rejected Mr. Fujieki's requests.  At this time, tension began to mount among members of the Board.

In late 1990, Mr. Fujieki retained Coopers & Lybrand to determine a reasonable level of compensation for Mr. DeJoria.  On January 11, 1991, Coopers & Lybrand preliminarily determined that a reasonable level of compensation was within the range of $600,000 to $1 million, with a possible $2 million ceiling.  At the January 10, 1992, Board meeting, the Board approved Mr. DeJoria's compensation at 13 percent of JPMS' gross sales, not to exceed $17 million per year, for JPMS' fiscal years ended July 31, 1992 through 1996.  Mr. Fujieki objected to this approval by the Board.

Mr. Fujieki proposed to have the compensation dispute resolved by arbitration, but Mr. DeJoria refused.  Accordingly, in June 1993, Mr. Fujieki brought suit against Mr. DeJoria, Ms. Re, and

JPMS on the Trust's behalf, alleging that Mr. DeJoria's compensation was excessive. The suit was filed in both the Superior Court for the State of California and the U.S. District Court for the Central District of California.

In response to Mr. Fujieki's allegations of shareholder derivative claims, JPMS formed a Special Litigation Committee (SLC) comprising JPMS' outside directors: Kenin Spivak, Paul Rupert, and David Tisdale. Among other things, the SLC was to evaluate Mr. Fujieki's allegations to decide whether to pursue the derivative claims on JPMS' behalf. The SLC hired Towers Perrin as executive compensation consultants to assist the SLC.

In April 1995, the litigation between the Trust and JPMS was settled; the SLC determined that the settlement agreement was in JPMS' best interests. The JPMS Board and shareholders, as well as the court, approved the settlement agreement. Neither the SLC, the JPMS Board, nor the court determined that Mr. DeJoria's compensation was unreasonable.

N. The Estate Tax Return, Notice of Deficiency, and Petition

On its estate tax return, petitioner valued the Trust's interest in the 1,226 shares of JPMS common stock at the moment of decedent's death at $28.5 million. This figure was based upon a KPMG valuation analysis prepared at Mr. Fujieki's request. (KPMG utilized both the comparable companies and discounted cash-flow analyses.)

In the notice of deficiency, respondent determined, in pertinent part, that petitioner had undervalued the JPMS common stock. Respondent determined that the fair market value of the Trust's interest in the 1,226 shares of JPMS common stock at the moment of death was $105 million. Accordingly, respondent determined that the value of the gross estate should be increased by $76.5 million. The notice also determined section 6662(g) and (h) penalties.

Petitioner filed a petition in this Court challenging respondent's moment-of-death valuation for the Trust's 1,226 shares of JPMS common stock, essentially restating the position taken on the estate tax return. In the original answer to petitioner's petition, respondent restated the position taken in the notice of deficiency. Following the trial in this case, petitioner filed an amended petition alleging that the value of the 1,226 shares of JPMS common stock as of April 21, 1989, was $23,062,000, rather than the $28.5 million reflected on both the estate tax return and the original petition. In the answer to the amended petition, respondent denied the allegations contained in petitioner's amended petition.

## ULTIMATE FINDING OF FACT

The moment-of-death value of the 1,226 shares of JPMS common stock held by the Trust and includable in decedent's gross estate was $41,532,600.

OPINION

Issue 1.  Moment-of-Death Value of JPMS Stock

The primary issue for decision is the moment-of-death value of 1,226 shares of JPMS common stock held by the Trust.  Petitioner now contends that the stock was worth between $23,062,000 and $29 million.  Respondent now asserts the value to be $81 million, or $24 million less than that determined in the notice of deficiency.

Section 2031(a) requires a decedent's "gross estate" to be determined for Federal estate tax purposes "by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  Value is determined at the moment of death.[12]  Ahmanson Found. v. United States, 674 F.2d

---

[12]    The following statements made by the Court of Appeals for the Fifth Circuit in United States v. Land, 303 F.2d 170, 172 (5th Cir. 1962), are, in our opinion, pertinent to our determination that the valuation of the 1,226 shares of JPMS common stock held by the Trust must be pinpointed to the moment of Mr. Mitchell's death:

> Brief as is the instant of death, the court must pinpoint its valuation at this instant--the moment of truth, when the ownership of the decedent ends and the ownership of the successors begins.  It is a fallacy, therefore, to argue value before-- or--after death on the notion that valuation must be determined by the value either of the interest that ceases or of the interest that begins. Instead, the valuation is determined by the interest that passes, and the value of the interest before or after death is pertinent only as it serves to indicate the value at death.  In the usual case death brings no change in the value of property.

(continued...)

761, 767 (9th Cir. 1981); <u>Estate of McClatchy v. Commissioner</u>, 106 T.C. 206, 210 (1996).  The standard for valuation is fair market value, defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973) (quoting section 20.3031-1(b), Estate Tax Regs.); <u>Collins v. Commissioner</u>, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo. 1992-478.  This objective test requires property to be valued from the viewpoint of a hypothetical buyer and seller, each of whom would seek to maximize his or her profit from any transaction involving the property.  See <u>Estate of Watts v. Commissioner</u>, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1005-1006 (5th Cir. 1981).  The value of property is a question of fact, and we consider all relevant facts and circumstances. E.g., <u>Ahmanson Found. v. United States</u>, <u>supra</u> at 769; <u>Hamm v. Commissioner</u>, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 423-424

---

[12](...continued)
It is only in the few cases where death alters value, as well as ownership, that it is necessary to determine whether the value at the time of death reflects the change caused by death, for example, loss of services of a valuable partner to a small business.

(1993);   Messing v. Commissioner, 48 T.C. 502, 512 (1967); sec. 20.2031-1(b), Estate Tax Regs.   Fair market value may be affected by future events that were reasonably foreseeable at the valuation date. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987); Gray v. Commissioner, 2 B.T.A. 672, 682 (1925); Estate of Livermore v. Commissioner, T.C. Memo. 1988-503.

Determining the fair market value of a closely held corporation's capital stock is difficult because it involves property that has no public market.   The best method for valuing closely held stock is by reference to an actual arm's-length sale of the stock in the normal course of business within a reasonable time before or after the valuation date.   See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Estate of Campbell v. Commissioner, T.C. Memo. 1991-615; sec. 20.2031-2(b), Estate Tax Regs.   In the absence of an arm's-length sale, the fair market value of closely held stock must be determined indirectly by considering, inter alia:

   (a)  The nature of the business and the history of the enterprise from its inception.

   (b)  The economic outlook in general and the condition and outlook of the specific industry in particular.

   (c)  The book value of the stock and the financial condition of the business.

   (d)  The earning capacity of the company.

   (e)  The dividend paying capacity [of the company].

(f)  Whether or not the enterprise has goodwill or other intangible value.

(g)  * * * the size of the block of stock to be valued.

(h)  The market price of stocks of corporations engaged in the same line or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Rev. Rul. 59-60, sec. 4.01, 1959-1 C.B. 237, 238-239; see also sec. 20.2031-2(f), Estate Tax Regs.  These factors cannot be applied with mathematical precision. See Rev. Rul. 59-60, supra, 1959-1 C.B. at 238.  Rather, the weight accorded each factor must be tailored to account for the particular facts under consideration. See Messing v. Commissioner, supra.

Both parties relied upon expert valuations.  At times, expert testimony aids the Court in determining valuation; in other instances, it does not.  See Laureys v. Commissioner, 92 T.C. 101, 129 (1989).  We are not bound by an expert's formulae and opinions, especially when they run contrary to our judgment. Chiu v. Commissioner, 84 T.C. 722, 734 (1985).  Instead, we may reach a decision as to the value of the property based on our own analysis of all the evidence in the record, Hamm v. Commissioner, supra at 941, using all of one party's expert opinion, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or selectively using any portion of such an opinion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

In sum, we will consider expert opinion testimony to the extent it assists our fair market value determination. Valuation is an approximation, and the figure we reach need not be one as to which there is specific testimony. Our role is to approximate fair market value as closely as possible, within the range of figures that may properly be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

A. Valuations of Petitioner's Experts

1. The Weiksner Report

Petitioner's first expert, George B. Weiksner, is a managing director and senior adviser of CS First Boston, an investment banking firm. Mr. Weiksner has 25 years of investment banking experience.

Mr. Weiksner's report valued the Trust's 49.04 percent interest in JPMS common stock (1,226 shares) at $20,634,000 to $25,489,000, with a midpoint value of $23,062,000. Mr. Weiksner's report began with a comparable companies analysis[13] that (1)

_____

[13] Comparable companies analysis is a public market valuation tool that values a company by reference to publicly traded companies with similar operating and financial characteristics. The first step involves identifying appropriate comparable companies and measuring their enterprise and equity values as multiples of financial benchmarks. Mr. Weiksner considered seven comparable companies.

The second step in the comparable companies analysis involves applying the derived multiples to the corresponding actual and projected financial benchmarks of the company subject

(continued...)

selected five standard multiples (net sales, operating cash-flow--EBITDA, operating income--EBIT, net income, and cash flow), (2) determined the ranges of applicable multiples from the comparable companies data, and (3) applied the multiple ranges to JPMS' "normalized" financial data (making adjustments to the financial data generated in the earnings model).[14]  From the value ranges thus derived, Mr. Weiksner determined a comparable companies value range for JPMS of $85 million to $105 million.  He then determined JPMS' public value[15] of $76.5 million to $94.5 million by subtracting from JPMS' comparable companies value a 10-percent extraordinary risk discount.  This discount accounted for: (1) The approximate cost of replacing Mr. Mitchell's services that was estimated in the projections of JPMS' operating expenses; (2) operational

---

[13](...continued)
to valuation.  In order to create that set of financial benchmarks, Mr. Weiksner developed an earnings model for JPMS, which forecast the company's results for a 5-year period and "normalized" the actual and projected financial results to reflect JPMS' profile going forward.

[14]    Mr. Weiksner used the earnings model to portray how a hypothetical buyer or seller of the JPMS stock would perceive JPMS as of the moment of decedent's death, given the information available at that date.  Among other things, Mr. Weiksner's adjustments to JPMS' historical financial data included: (1) The removal of Mr. Mitchell's compensation as an expense; (2) adding an amount equal to 8 percent of net sales as additional sales, general, and administrative expenses in lieu of Mr. Mitchell's compensation; and (3) the adjustment of Mr. DeJoria's compensation to $16 million to reflect his average anticipated compensation.

[15]    Public value refers to the estimated value of liquid, freely trading shares of JPMS as if it had been a public company.

difficulties; (3) dependence on Mr. DeJoria; and (4) difficulty in maintaining future growth. Mr. Weiksner believed that these risks were unique to JPMS at the valuation date and warranted the discount of the stock.

Mr. Weiksner subsequently calculated the proportionate public value of the shares and adjusted that value by a 45-percent discount to reflect minority interest and lack of marketability,[16] to arrive at a $20,634,000 to $25,489,000 private value[17] for the 1,226 JPMS shares. At trial, Mr. Weiksner suggested a 30- to 50-percent range for these discounts.

In addition to the comparable companies analysis, Mr. Weiksner utilized the comparable acquisitions and discounted cash-flow analyses as confirming methodologies. Mr. Weiksner valued JPMS through the comparable acquisitions analysis by reference to private market sales of similar businesses, thereby generating control values.[18] Mr. Weiksner identified appropriate comparable transactions and measured the enterprise and equity values of

---

[16] A minority shareholder discount reflects the decreased value of shares that do not convey control of a closely held corporation. A lack of marketability discount reflects the fact that there is no ready market for shares in a closely held corporation.

[17] Private value refers to the value of a minority interest in stock for which no liquid public trading market exists.

[18] Control value is the value of a company in a transaction in which the acquirer acquires the controlling stock.

target companies as multiples of financial benchmarks. Then he applied those multiples to the corresponding actual and projected financial benchmarks of JPMS. Accordingly, Mr. Weiksner applied his comparable acquisitions multiples to the normalized data for JPMS that he created from his earnings model to determine a range of control values for JPMS. The $110 million to $135 million control value that he determined exceeded JPMS' comparable companies value by approximately 29 percent and exceeded JPMS' public value by approximately 43 percent, within his expectations of an appropriate control premium.

In his discounted cash-flow analysis, Mr. Weiksner valued JPMS as the sum of its projected cash-flows before financing costs over several years plus an estimated value of the company at the end of the forecast period, all discounted to present value. He determined a range of terminal values through his comparable companies analysis and a range of appropriate discount rates through an adjusted weighted average cost of capital analysis. The $115 million to $140 million control value that Mr. Weiksner determined for JPMS through this analysis exceeded JPMS' comparable companies value by approximately 34 percent and JPMS' public value by approximately 49 percent, within his expectation of an appropriate premium.

We note that at trial, Mr. Weiksner suggested a $110 million to $135 million range of control values for JPMS on April 21, 1989.

### 2.  The McGraw Report

Petitioner's second expert, Kenneth W. McGraw, is managing director of Patricof & Co. Capital Corp., an investment banking firm. He has approximately 36 years of experience in finance markets and investment banking.

Utilizing a comparative companies analysis, Mr. McGraw valued the 1,226 shares of JPMS common stock at approximately $29 million. (In this analysis, he used virtually the same group of comparable public companies as Mr. Weiksner.) Mr. McGraw adjusted JPMS' financial data in deriving an earnings model to which he applied his comparable companies analysis.  To represent the amount JPMS would have to spend to replace the benefits of Mr. Mitchell's services, Mr. McGraw estimated that additional expenditures for advertising and administrative expenses would increase JPMS' advertising and promotional expenses to 16 percent of total revenues.  He also removed Mr. Mitchell's compensation expense from the financial data.[19]

Mr. McGraw reduced his approximate $109 million theoretical publicly traded value for JPMS by an extraordinary risk discount, through a 15-percent reduction to his average EBIT and average EBITDA.  Mr. McGraw then applied a 45-percent marketability

---

[19]    Mr. McGraw did not believe that a reduction in Mr. DeJoria's compensation was a circumstance upon which a prospective purchaser of the shares could reasonably depend. Thus, he did not adjust Mr. DeJoria's historical compensation for purposes of this analysis.

discount[20] to the value he determined through the comparative companies analysis, resulting in a $29.5 million value for the 1,226 shares of JPMS common stock.

In addition to his comparative companies analysis, Mr. McGraw utilized a discounted cash-flow analysis, determining a pro rata equity value of $49.5 million. In this analysis, he also applied a 45-percent discount for lack of marketability, yielding a $27.2 million value for the 1,226 shares of JPMS common stock.

Mr. McGraw weighed his comparative companies analysis more heavily than his discounted cash-flow analysis; in his opinion, the comparative companies analysis was the "more reliable indicator of value". Accordingly, relying on this analysis, Mr. McGraw concluded that the fair market value of the 1,226 shares of JPMS common stock was approximately $29 million.

B.  Valuations of Respondent's Experts

1.  The Hanan Report

Respondent offered Martin D. Hanan, president of Business Valuation Services, Inc. (BVS), as an expert witness. He has worked as an appraiser for many years. Mr. Hanan valued the 1,226 shares of JPMS common stock at $81 million, relying on both the comparable companies[21] and discounted cash-flow analyses.

---

[20]  On the basis of Mr. McGraw's methodology, no discount for minority interest was taken.

[21]  Mr. Hanan refers to this approach as the "guideline company" approach.

In his comparable companies analysis, Mr. Hanan utilized practically the same group of comparable public companies used by Mr. Weiksner. Mr. Hanan began with normalizing JPMS' financial results. For instance, Mr. Hanan concluded that the combined compensation paid to Messrs. Mitchell and DeJoria would not have exceeded $2.5 million if they were paid under arm's-length conditions; Mr. Hanan thus adjusted the historical financial performance to reflect arm's-length rates. He believed that a shareholder of the 49-percent block would likely reach an accommodation with Mr. DeJoria regarding his compensation before agreeing to a price for those shares. For purposes of this analysis, Mr. Hanan accordingly assumed Mr. DeJoria's compensation would be set at $5 million per year after the valuation date.

Mr. Hanan's comparable companies analysis indicated a $272 million value for JPMS on a publicly traded, minority interest basis. He subsequently applied a 30-percent discount for lack of marketability (concluding that JPMS' size, profitability, shareholder rights, dividend paying capacity and policy, as well as transfer restrictions, all favored a below-average marketability discount, while Mr. DeJoria's anticipated intention to continue drawing excessive compensation favored an above-average marketability discount). By applying the 30-percent discount to his $272 million value for JPMS, Mr. Hanan determined an $81 million fair market value for the 1,226 shares of JPMS common stock as of April 21, 1989.

In his discounted cash-flow analysis, Mr. Hanan projected JPMS' anticipated cash-flows for 5 years after 1989, and discounted the cash-flows to a present value at the valuation date. For purposes of this analysis, Mr. Hanan again assumed executive compensation would be set at $5 million. Accordingly, Mr. Hanan determined that as of April 21, 1989, the discounted cash-flow control value of JPMS was $295 million, while the discounted cash-flow value of JPMS' equity was $218 million on a publicly traded, minority-interest basis.

Finally, although Mr. Hanan proposed an $81 million fair market value for the 1,226 shares of JPMS common stock, he concedes that "because of a likely disagreement between the buyer/seller and [Mr.] DeJoria over [Mr.] DeJoria's compensation and the possibility of litigation, the value of the subject stock could be as high as $165.3 million and as low as $57.7 million."[22]

### 2. The Brennan Report

Respondent also offered the expert report of E. James Brennan III,[23] president of Brennan, Thomsen Associates, Inc. Mr. Brennan regularly testifies as an expert witness regarding personnel management and pay practices, particularly in the area of executive compensation.

---

[22] Mr. Hanan reached the $57.7 million figure by assuming that Mr. DeJoria's compensation would be set at $12 million for fiscal year 1990 and $17 million per year thereafter.

[23] Respondent chose not to put E. James Brennan III on the stand.

Mr. Brennan's report evaluated the reasonable level of compensation for services provided by Messrs. Mitchell and DeJoria prior to Mr. Mitchell's death and made an estimate of the reasonable level of compensation for Mr. DeJoria for the 5 fiscal years following Mr. Mitchell's death. Mr. Brennan opined that the amounts Messrs. Mitchell and DeJoria paid themselves for the 1984-89 fiscal years were far in excess of the maximum amounts paid to comparable top executives at equivalent enterprises for employee services. Mr. Brennan concluded that the maximum level of reasonable compensation for Mr. DeJoria for 1990-94 would range between $820,300 and $1,159,420, based on projections of an increase in sales revenue for those years.

C. Critique of Experts

Not unexpectedly, each party criticized the opposing experts' analyses. The following points highlight these disparate perspectives.

1. Respondent's Arguments

Respondent criticizes Messrs. Weiksner's and McGraw's valuations as based on the mistaken assumption that JPMS was a fragile, disorganized, mismanaged, problem-ridden company on the verge of collapse as of April 21, 1989. Moreover, respondent criticizes three aspects of petitioner's comparable companies analyses: (1) The kinds of multiples selected, the time periods to which the multiples relate, and their weighting; (2) the adjustments made to JPMS' financial data; and (3) the adjustments

for risk and illiquidity. Respondent argues that petitioner's experts' analyses were essentially based upon subjective judgment. In fact, respondent believes that petitioners' experts failed to offer a credible basis for their extraordinary risk or illiquidity discounts.

Respondent further argues that Mr. Weiksner's "normalized" earnings model, which he applies over a 3-year period, is inaccurate and misleading because 2 of the 3 years ended after the valuation date; thus, the figures for those years are essentially a projection rather than an analysis of actual results.

With regard to Messrs. Weiksner's and McGraw's discounted cash-flow analyses, respondent first argues that these analyses fail to confirm the comparative companies method values these experts determined. Respondent posits that Mr. Weiksner's discounted cash-flow analysis assumes that Mr. DeJoria's future compensation will conform to Mr. DeJoria's expectation of $12 million in fiscal year 1990 and $17 million per year thereafter. However, according to respondent, Mr. Weiksner's discounted cash-flow analysis actually presumes no control over Mr. DeJoria's compensation or any other element of JPMS' cash-flows. Thus, respondent argues that Mr. Weiksner's result is a minority interest value rather than a control value.

2. Petitioner's Arguments

Petitioner counters that Mr. Hanan's valuation has four erroneous bases: (1) Nonexistent "projections" of Mr. DeJoria; (2)

an unreasonable assumption that Mr. DeJoria would unilaterally reduce his compensation to $5 million as of the valuation date; (3) a nonexistent "transition plan"; and (4) financial information not available as of Mr. Mitchell's date of death. (In fact, petitioner asserts that both Mr. Hanan's discounted cash-flow and comparable companies analyses improperly rely on KPMG's projections of JPMS' operating results following Mr. Mitchell's death.)

More specifically, petitioner first argues that the "DeJoria projections" referred to by respondent are the projections developed by KPMG with the benefit of 8 months of hindsight and yearend audited financial data not available on April 21, 1989. Petitioner contends that the projections did not exist at the valuation date and would not have been knowable to a hypothetical buyer or seller.

Second, petitioner contends that it would be unreasonable and unrealistic to assume, as Mr. Hanan did, that Mr. DeJoria's compensation could be reduced by any means short of litigation. Petitioner contends that most buyers are litigation averse. Therefore, petitioner posits, the only reasonable assumption is that Mr. DeJoria would receive compensation in the amounts of $12 million for JPMS' 1990 fiscal year and $17 million per year thereafter.

Third, according to petitioner, respondent refers to a "transition plan" Mr. DeJoria developed when he learned of Mr.

Mitchell's illness. Petitioner suggests that no concrete plan ever existed.

Fourth, petitioner argues that Mr. Hanan relied on post-April 21, 1989, information in developing his discounted cash-flow model. He used data from fiscal year ended July 31, 1989 (taken from JPMS' annual certified financial statements) in deriving his April 21, 1989, base year. However, this information was not available until the late fall of 1989. Thus, petitioner argues, Mr. Hanan premised his base year data on JPMS' actual financial results that, by definition, could not have been available at the valuation date. Furthermore, petitioner contends that Mr. Hanan mechanically used the KPMG projections (which he referred to as the "DeJoria projections") to compute his discounted cash-flow.

In short, petitioner contends that while Mr. Hanan's discounted cash-flow purports to be a minority interest discounted cash-flow, in reality it is a control discounted cash-flow. According to petitioner, Mr. Hanan improperly changed the capital structure of JPMS, adding long-term debt on the assumption that a minority shareholder could influence capital structure.

Finally, petitioner opines that Mr. Hanan's exorbitant control value is irreconcilable with Minnetonka's $125 million offer for all of the JPMS stock. Petitioner urges the Court to dismiss Mr. Hanan's conclusions as unrealistic.

D.  Court's Analysis and Conclusion

We have considered all of the testimony before us, as well as the expert witness reports, and have weighed all other relevant factors.  As articulated by the parties, each expert witness report is susceptible to criticism.  We are unable to accept the moment-of-death valuations given to the 1,226 shares of JPMS common stock by any of the expert witnesses.  Instead, we rely on our own analysis, based on all the evidence in the record.

We begin our analysis by placing a $150 million value on JPMS at the moment immediately prior to Mr. Mitchell's death.  In determining this value, we considered all the evidence but gave the greatest consideration to Minnetonka's "real world" $125 million offer in the fall of 1988 (which Mr. DeJoria found "a little short") and Mr. DeJoria's representation to Mr. Taylor that he had received from Gillette a $150 million offer plus a royalty of 2 percent of sales for a lifetime (which Mr. Taylor found to be an offer he could not match).

We next consider the impact of Mr. Mitchell's death on JPMS. Mr. Mitchell embodied JPMS to distributors, hair stylists, and salon owners.  He was vitally important to its product development, marketing, and training.  Moreover, he possessed a unique vision that enabled him to foresee fashion trends in the hair styling industry.  It is clear that the loss of Mr. Mitchell, along with the structural inadequacies of JPMS, created uncertainties as to the future of JPMS at the moment of death.

In particular, a hypothetical buyer or seller would have to consider the following factors in valuing the 1,226 shares of JPMS common stock at the moment of Mr. Mitchell's death: (1) Whether it would be necessary to increase JPMS' advertising and marketing expenses;[24] (2) whether litigation concerning Mr. DeJoria's compensation would ensue; (3) whether the lack of a ready or available market for the stock would affect its fair market value; (4) whether and how JPMS would continue its history of successful product development and styling leadership; (5) whether rumors concerning JPMS "going retail" would adversely affect its relationships with salons; (6) whether JPMS' history of unreliable suppliers would continue; (7) whether JPMS would solve its inventory control and financial information reporting problems; and (8) whether JPMS' thin management and total reliance on Mr. DeJoria would hinder its performance.

Nonetheless, Mr. DeJoria stepped in to single-handedly run JPMS upon Mr. Mitchell's death. Mr. DeJoria had always overseen JPMS' marketing. Indeed, despite his reputation for creativity, Mr. Mitchell had not succeeded in marketing his product line in the late 1970's. Although there is no doubt that Mr. Mitchell's fame was an important component in launching JPMS in the early 1980's,

---

[24] William E. Peplow, vice president of salon relations for Redken, wrote a report and testified on petitioner's behalf. He foresaw that JPMS would have to increase its advertising budget to sustain sales after Mr. Mitchell's death.

Mr. DeJoria's salesmanship, marketing savvy, and construction of the distribution network were also vitally important.

In addition, Mr. Taylor, whom we found extremely credible, testified that Mr. Mitchell was not as essential to Minnetonka's interest in JPMS as Mr. DeJoria. Mr. Taylor also observed that the deaths of fashion designers Perry Ellis and Anne Klein did not affect their ongoing businesses to any significant degree "because the consumer somehow is so far removed from the actual * * * involvement of that designer * * * they're still buying the product."

In our opinion, the $150 million value for JPMS at the moment immediately prior to Mr. Mitchell's death should be discounted by 10 percent to reflect the loss of Mr. Mitchell to JPMS. Thus, we believe that at the moment of Mr. Mitchell's death, JPMS had a value of $135 million.

We further believe: (1) A total 35-percent discount is appropriate, reflecting combined discounts for lack of marketability and minority interest; and (2) a $1.5 million discount, reflecting the possibility of a lawsuit over Mr. DeJoria's compensation, should be applied. Taking these factors into consideration, we find, and thus hold, that the value of

decedent's interest was $41,532,600[25] as of the moment of his death.

Issue 2.  Section 6662(g) Penalty

The final issue is whether petitioner is liable for the section 6662(g) penalty. A substantial estate tax valuation understatement occurs if the value of property claimed on a return is 50 percent or less of the amount determined to be its correct value, and the portion of the underpayment attributable to the understatement exceeds $5,000.  Sec. 6662(g).  The penalty equals 20 percent of the portion of the underpayment attributable to the understatement.  Sec. 6662(a).  The penalty does not apply to any

---

[25]     This amount is calculated as follows:

| | |
|---|---|
| Value of JPMS at the moment immediately prior to Mr. Mitchell's death | $150,000,000 |
| Less:  Discount to reflect the loss of Mr. Mitchell to JPMS | (15,000,000) |
| Value of JPMS at the moment of Mr. Mitchell's death | 135,000,000 |
| Percent of Trust's interest in JPMS | x    49.04 |
| Value of Trust's interest in JPMS prior to discounts | 66,204,000 |
| Discount for lack of marketability and minority interest (35%) | (23,171,400) |
| | 43,032,600 |
| Discount for possibility of lawsuit | (1,500,000) |
| Value of Trust's interest in JPMS after discounts | 41,532,600 |

portion of the underpayment for which the taxpayer shows that he or she: (1) Had reasonable cause, and (2) acted in good faith with respect thereto. Sec. 6664(c); see also United States v. Boyle, 469 U.S. 241, 242 (1985). Whether a taxpayer had reasonable cause and acted with good faith is a factual determination. Sec. 1.6664-4(b), Income Tax Regs.

The parties agree that the section 6662(g) penalty is inapplicable unless the Court decides that the moment-of-death value of the 1,226 shares of JPMS common stock was $57 million or more.[26] On the basis of our determination that the fair market value of the 1,226 shares of JPMS stock as of April 21, 1989, was $41,532,600, the section 6662(g) penalty does not apply.

In light of the foregoing, and to reflect concessions and settled issues,

Decision will be

entered under Rule 155.

---

[26] The Federal estate tax return valued the stock at $28.5 million. For sec. 6662(g) to apply, the value reported on the return must not be more than 50 percent of the correct value.