T.C. Memo. 2002-98

UNITED STATES TAX COURT

ESTATE OF PAUL MITCHELL, DECEASED, PATRICK T. FUJIEKI, EXECUTOR,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 21805-93.          Filed April 9, 2002.

<u>David Wing Keong Wong</u>, <u>Miriam Louise Fisher</u>, <u>Karen L. Hirsh</u>,
and <u>Melvin E. Lefkowitz</u>, for petitioner.

<u>Henry E. O'Neill</u>, <u>Alan Summers</u>, and <u>Paul G. Robeck</u>, for
respondent.

---

[*]     This Memorandum Opinion supplements our Memorandum
Opinion in <u>Estate of Mitchell v. Commissioner</u>, T.C. Memo. 1997-
461, vacated and remanded 250 F.3d 696 (9th Cir. 2001).

- 2 -

SUPPLEMENTAL MEMORANDUM OPINION

JACOBS, Judge: This case is before us on remand from the Court of Appeals for the Ninth Circuit. Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), affg. 103 T.C. 520 (1994) and vacating and remanding T.C. Memo. 1997-461. The Court of Appeals has directed us to shift the burden of proof to respondent regarding the determination of additional taxes and to explain our valuation of stock included in decedent's estate for purposes of Federal estate tax consistent with the standards established in Leonard Pipeline Contractors v. Commissioner, 142 F.3d 1133 (9th Cir. 1998), revg. and remanding T.C. Memo. 1996-316.[1]

We incorporate herein the findings of fact set forth in Estate of Mitchell v. Commissioner, T.C. Memo. 1997-461, by this reference. For ease of understanding, we herein summarize the relevant facts from that opinion as well as set forth additional findings of fact for the purpose of deciding the issue on remand. The stipulations and exhibits are also incorporated herein by this reference.

Background

---

[1] On remand, in Leonard Pipeline Contractors v. Commissioner, T.C. Memo. 1998-315, affd. without published opinion 210 F.3d 384 (9th Cir. 2000), we reentered our decision.

Paul Mitchell (Mr. Mitchell or decedent) died on April 21, 1989. Among the assets included in Mr. Mitchell's taxable estate were 1,226 shares of John Paul Mitchell Systems common stock held by the Paul Mitchell Trust (the trust), a revocable trust established by Mr. Mitchell. It is our determination of the value of those shares (at the moment of Mr. Mitchell's death) that is the subject of the remand.

In 1979, Mr. Mitchell and John Paul "Jones" DeJoria joined together to market Mr. Mitchell's hair care products (particularly the sculpting lotion) through professional-only hair salons. On March 31, 1980, Messrs. Mitchell and DeJoria formed Paul Mitchell Systems, Inc. The name of the corporation was subsequently changed to John Paul Mitchell Systems (JPMS). Messrs. Mitchell and DeJoria granted JPMS all proprietary and distribution rights to the hair and skin products that Mr. Mitchell had developed, including the products' trademark, service mark, or other intellectual property rights.

JPMS's bylaws provided for a board of directors (the board) consisting of four directors and cumulative voting for the election of directors. However, from 1984 until April 15, 1989, Mr. Mitchell, Mr. DeJoria, and Peter Langenberg were the only board members. On April 15, 1989, Mr. Langenberg resigned, and Jeanne Braa was elected to replace him.

From 1984 until April 1989, Mr. Mitchell served as president of JPMS; Mr. DeJoria served as chairman of the board, chief executive officer, chief financial officer, and secretary.

JPMS adopted a fiscal year ending July 31. Beginning with the fiscal year ended July 31, 1984, the corporation elected subchapter S status for Federal income tax purposes.

As of April 21, 1989, the stock in JPMS had not been registered under any securities law; moreover, neither Mr. DeJoria nor Mr. Mitchell had ever contemplated such a registration or a public offering of JPMS's common stock.

JPMS products were sold only through professional salons. Mr. Mitchell was the heart of JPMS's connection to hair stylists, who were the foundation for JPMS's marketing strategy of promoting and selling products that Mr. Mitchell developed. Mr. Mitchell was JPMS's creative trendsetter, and his hair sculpting technique revolutionized hair styling. Mr. Mitchell was the focal point of JPMS's advertising. In 1986, JPMS began using photographs of Mr. Mitchell in its advertising.

Mr. DeJoria ran the daily operations at JPMS, making all management decisions and having all managers reporting directly to him. Mr. Mitchell, however, had the last word on all policy matters.

JPMS was known for its styling products. Over the years, JPMS developed into a major force in the hair care industry, with brand

recognition by the consuming public, a sophisticated distribution network, and hundreds of hair stylists trained in the use of the company's products. From 1982 through April 21, 1989, JPMS's share of the salon-only market, in comparison with those of its chief competitors, improved every year. In April 1989, JPMS was among the top five companies in the salon-only market.

From JPMS's inception until Mr. Mitchell's death in April 1989, neither Mr. Mitchell nor Mr. DeJoria had any formal contract with JPMS regarding compensation. Instead, they set sales and profitability goals for JPMS at the beginning of each fiscal year. Thereafter, in September or October of each year, they divided equally the company's available income.

For fiscal years ended July 31, 1984 through 1988, Messrs. Mitchell and DeJoria each received the following payments from JPMS:

| FYE 7/31 | Salary | Management Fees | Total |
|----------|--------|-----------------|-------|
| 1984 | --- | --- | [1]$1,086,500 |
| 1985 | --- | --- | [1]2,305,000 |
| 1986 | --- | --- | [1]4,162,525 |
| 1987 | $185,125 | $8,565,000 | 8,750,125 |
| 1988 | 1,308,000 | 10,500,000 | 11,808,000 |

[1]    Payments to Messrs. Mitchell and DeJoria for this year were not broken down into salary or management fees.

JPMS characterized these payments as compensation for services rendered.

Between August 1, 1988, and April 21, 1989, JPMS paid Mr. Mitchell $10,758,046 (which JPMS characterized as compensation for

services rendered).   For fiscal year 1989, Messrs. Mitchell and DeJoria agreed that each of them would receive a $2 million annual salary and a $15 million management fee.   The JPMS board approved these compensation amounts on October 21, 1988.

From the inception of JPMS until the moment of Mr. Mitchell's death, the only dividend declared by JPMS was for its fiscal year ended July 31, 1988.   The dividend was originally set at $1.4 million, but the dividend was subsequently raised to $2.5 million.

Robert Taylor was president and chief executive officer of Minnetonka Corp. (Minnetonka), a publicly traded company.   As chairman, Mr. Taylor was responsible for Minnetonka's strategic acquisitions.

Mr. Taylor initiated discussions with Mr. DeJoria in the fall of 1987 (JPMS's 1988 fiscal year) when JPMS's sales were approximately $50 million.   Mr. Taylor informed Mr. DeJoria that Minnetonka was willing to pay $100 million to acquire all of the JPMS stock, assuming officers' salaries were revised.   Mr. Taylor regarded the level of compensation for Messrs. Mitchell and DeJoria as too high; he considered a more appropriate level of compensation to be in the $500,000 to $1 million range, including performance bonuses.   Mr. DeJoria insisted on a $125 million acquisition price. Mr. Taylor refused to raise Minnetonka's bid, and the negotiations were terminated.

In the fall of 1988, Mr. Taylor again approached Messrs. DeJoria and Mitchell. (At the time, JPMS's sales were in the $65 million range.) Mr. Taylor offered $125 million to acquire all of the JPMS stock. The proposed acquisition price assumed that: (1) Mr. DeJoria would continue managing JPMS; (2) Mr. Mitchell would continue promoting the products for at least 18 months to 2 years; and (3) both Messrs. Mitchell and DeJoria would be compensated in salary and stock at a level paid to officers of other Minnetonka subsidiaries, such as Calvin Klein.

Mr. DeJoria did not accept Minnetonka's $125 million offer; he believed that Minnetonka was "just a little short every time". (Mr. DeJoria represented to Mr. Taylor that he had received from the Gillette Co. (Gillette) a $150 million offer plus a royalty of 2 percent of sales for life. Mr. Taylor informed Mr. DeJoria that he could not match Gillette's offer.) Sales discussions with Minnetonka thus ended.

KPMG Peat Marwick (or one of its predecessors) certified JPMS's audited financial statements. JPMS's net sales and net income after taxes for fiscal years ended July 31, 1982 through 1988, inclusive, were as follows:

| FYE 7/31 | Net Sales | Net Income After Taxes |
|----------|-----------|------------------------|
| 1982 | $1,369,316 | $142,375 |
| 1983 | 3,590,641 | 159,947 |
| 1984 | 5,349,152 | 4,004 |
| 1985 | [1]11,266,610 | 207,777 |
| 1986 | 24,131,739 | 2,265,875 |
| 1987 | 41,371,318 | 281,777 |
| 1988 | 60,693,857 | 2,569,297 |

[1]    The audited financial statements for the years ended July 31, 1986 and 1985, state this amount as $10,918,252.

Until approximately May 1988, Mr. Mitchell's health had been good.  In July 1988, he was hospitalized and diagnosed as having pancreatic cancer; thereafter, his pancreas, spleen, gall bladder, and a portion of his stomach were surgically removed.  He remained in the hospital until September 30, 1988, undergoing additional surgeries and medical procedures, including radiation therapy. Although follow-up tests revealed no evidence of metastasis, a November 1988 blood test raised a possibility of a recurrence of cancer, but the test was inconclusive.

Although Mr. Mitchell continued his roles as the JPMS creative force, spokesman, and executive, his medical condition prevented him from working or performing at hair shows until approximately January 1989.

In February 1989, tests revealed a recurrence of cancer. Physicians encouraged Mr. Mitchell to begin chemotherapy, but he refused.  Mr. DeJoria avoided disclosing the severity of Mr. Mitchell's illness to quell any fears about the uncertainty of JPMS's future without Mr. Mitchell.

To a degree, the 1989 advertising campaign (which was shot in November or December 1988) still focused on Mr. Mitchell. However, Mr. DeJoria and JPMS began shifting emphasis away from Mr. Mitchell as an individual and towards the products themselves.

During the latter part of Mr. Mitchell's illness, Messrs. DeJoria and Mitchell discussed Mr. DeJoria's future compensation. Mr. DeJoria promised Mr. Mitchell that in the event of Mr. Mitchell's death, he would reduce his management fee from $15 million to $10 million for JPMS's fiscal year ending July 31, 1990. However, Mr. DeJoria's $2 million salary for that year was to remain intact.

Mr. Mitchell died on April 21, 1989, at the age of 53.

As of April 21, 1989, the common stock of JPMS was owned as follows:

|  | Number of Shares | Percent |
|---|---|---|
| Mr. DeJoria | 1,250 | 50.00 |
| The trust | 1,226 | 49.04 |
| Ms. Braa[1] | 16 | 0.64 |
| Angus Mitchell[1] | 8 | 0.32 |
| Total | 2,500 | 100.00 |

[1] Ms. Braa and Angus Mitchell, Mr. Mitchell's son, acquired their shares by gift from Mr. Mitchell.

On June 29, 1989, Patrick Fujieki, trustee of the trust, and Michaeline Re[2] were elected to the JPMS board. (The board thus

_____

[2] Ms. Re, an attorney, joined JPMS on Jan. 1, 1989, as vice president and general counsel, to oversee the correction of certain operational problems. On Mar. 1, 1989, she became JPMS's

(continued...)

comprised Mr. DeJoria, Ms. Braa, Mr. Fujieki, and Ms. Re.)  At this time, the trust was the shareholder of record of 49.04 percent of the outstanding common shares of JPMS, of which 1 percent was to be transferred to Mr. DeJoria in accordance with the terms of Mr. Mitchell's will and trust.

In June 1989, Mr. Fujieki (in his capacities as director of JPMS, trustee for the trust, and executor of Mr. Mitchell's estate) asked to inspect the JPMS corporate records and financial information.  On April 10, 1992, representatives of Mr. Fujieki were permitted to review JPMS's financial records but were not allowed to make copies.  Before permitting Mr. Fujieki's representatives to review its financial records, JPMS required Mr. Fujieki and his representatives to execute confidentiality agreements.

Mr. Fujieki continually questioned the actions of the JPMS board at its meetings and the accuracy of the corporate minutes. Beginning July 30, 1992, through at least April 20, 1993, James Ukropina, Esq., outside legal counsel for JPMS, attended the JPMS board meetings.

Mr. DeJoria assumed many of Mr. Mitchell's corporate responsibilities following Mr. Mitchell's death.  Between April 22 and July 31, 1989, JPMS paid Mr. DeJoria $4,901,537 as compensation

<hr>

[2](...continued)
chief operating officer.

for services rendered to JPMS.  For JPMS's fiscal year ended July 31, 1990, Mr. DeJoria agreed to reduce his management fee from $15 million to $10 million, as promised to Mr. Mitchell.  Mr. DeJoria also received $2 million in salary for that year.  In summary, JPMS paid Mr. DeJoria the following amounts for fiscal years ended July 31, 1990 through 1994:

| FYE 7/31 | Amount |
|----------|--------|
| 1990 | $12,000,000 |
| 1991 | 17,025,000 |
| 1992 | 17,025,568 |
| 1993 | 17,000,000 |
| 1994 | 17,000,000 |

JPMS characterized these payments as compensation for services rendered.

From August 1, 1989 through 1992, Mr. Fujieki repeatedly requested that the board retain an independent compensation consultant to consider the reasonableness of Mr. DeJoria's compensation.  The board rejected Mr. Fujieki's requests.  At this time, tension began to mount among members of the board.

In late 1990, Mr. Fujieki retained Coopers & Lybrand to determine a reasonable level of compensation for Mr. DeJoria.  Coopers & Lybrand preliminarily determined that a reasonable level of compensation was within the range of $600,000 to $1 million, with a possible $2 million ceiling.  At the January 10, 1992, board meeting, the board approved Mr. DeJoria's compensation at 13 percent of JPMS's gross sales, not to exceed $17 million per year,

for JPMS's fiscal years ended July 31, 1992 through 1996.  Mr. Fujieki objected to this approval by the board.

In June 1993, Mr. Fujieki brought suit against Mr. DeJoria, Ms. Re, and JPMS on the trust's behalf, alleging that Mr. DeJoria's compensation was excessive.  In April 1995, the litigation between the trust and JPMS was settled.  The JPMS board and shareholders, as well as the court, approved the settlement agreement.

On its estate tax return, the estate valued the trust's interest in the 1,226 shares of JPMS common stock at the moment of decedent's death at $28.5 million.  In the notice of deficiency, respondent determined that the fair market value of the trust's interest in the 1,226 shares of JPMS common stock at the moment of death was $105 million.  Accordingly, respondent determined that the value of the gross estate should be increased by $76.5 million.

The estate filed a petition in this Court challenging respondent's moment-of-death valuation for the trust's 1,226 shares of JPMS common stock.

In this Court's opinion, T.C. Memo. 1997-461, we held that the value of decedent's interest was $41,532,600 as of the moment of his death.  We calculated this amount as follows:

| | |
|---|---:|
| Value of JPMS at the moment immediately prior to Mr. Mitchell's death | $150,000,000 |
| Less: Discount to reflect the loss of Mr. Mitchell to JPMS | (15,000,000) |
| Value of JPMS at the moment of Mr. Mitchell's death | 135,000,000 |
| Percent of trust's interest in JPMS | x 49.04 |
| Value of trust's interest in JPMS before discounts | 66,204,000 |
| Discount for lack of marketability and minority interest (35%) | (23,171,400) |
| | 43,032,600 |
| Discount for possibility of lawsuit | (1,500,000) |
| Value of trust's interest in JPMS after discounts | 41,532,600 |

On appeal, the Court of Appeals for the Ninth Circuit vacated our decision and remanded the case for findings to explain our valuation. More specifically, the Court of Appeals stated that it is unclear whether a 35-percent combined discount for lack of control and lack of marketability falls within a range that is supported in the record.

Additionally, the Court of Appeals directed us to shift the burden of proof to respondent. Pursuant to the mandate of the Court of Appeals, we shift the burden of proof to respondent. Consequently, respondent has the burden of proving by a preponderance of the evidence the existence and the amount of the deficiency. Cohen v. Commissioner, 266 F.2d 5, 11 (9th Cir. 1959), remanding T.C. Memo. 1957-172.

The deficiency in this case is attributable to the valuation of 1,226 shares of JPMS common stock at the moment of decedent's death. On its estate tax return, the estate valued the shares at

$28.5 million. Thus, respondent must prove by a preponderance of the evidence that the value of the shares at the moment of decedent's death was greater than $28.5 million.

With the discussion that follows, we attempt to provide the Court of Appeals with a reasoned account of how we reach our valuation conclusion in this case, mindful that the burden of persuasion is on respondent.

## Discussion

Fair market value for Federal estate and gift tax purposes is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Snyder v. Commissioner, 93 T.C. 529, 539 (1989); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. The standard is objective; it uses a hypothetical willing buyer and willing seller. See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). However, "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of the stock". Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982).

When valuing unlisted stock, it may be appropriate to apply a discount for lack of marketability, a discount for a minority interest, or a premium for control.

Discounts for lack of marketability and lack of control are conceptually distinct when valuing stock of closely held corporations. Estate of Newhouse v. Commissioner, supra at 249. The distinction between the two discounts is succinctly stated in Estate of Andrews v. Commissioner, supra at 953:

> The minority shareholder discount is designed to reflect the decreased value of shares that do not convey control of a closely held corporation. The lack of marketability discount, on the other hand, is designed to reflect the fact that there is no ready market for shares in a closely held corporation. Although there may be some overlap between these two discounts in that lack of control may reduce marketability, it should be borne in mind that even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock. * * *

A control premium may be appropriate when valuing a large block of stock. A control premium represents the additional value associated with the shareholder's ability to control the corporation by dictating its policies, procedures, or operations. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1581-1582 (1987); Rev. Rul. 59-60, 1959-1 C.B. 237, 242.

Application of a premium for control is based on the principle that the per-share value of minority interests is less than the per-share value of a controlling interest. Estate of Salsbury v.

<u>Commissioner</u>, T.C. Memo. 1975-333. A premium for control is generally the percentage by which the amount paid for a controlling block of shares exceeds the amount which would have otherwise been paid for the shares if sold as minority interests. <u>Id.</u>

Although, generally, the minority discount is the inverse of the control premium, <u>Rakow v. Commissioner</u>, T.C. Memo. 1999-177, the control premium which is added to the majority block might be less than the proper minority discount to be attributed to a minority of the shares, <u>Estate of Chenoweth v. Commissioner</u>, <u>supra</u> at 1589-1590.

Whether a premium for control, a discount for a minority interest, or a discount for lack of marketability should be applied in valuing nonpublicly traded closely held stock depends on the valuation method employed in reaching the unadjusted value of the stock.

> The approach or approaches used in the valuation each lead to a value with certain characteristics (control/minority, marketable/nonmarketable, and so on). * * * The characteristics of the value produced by the approach dictate, to a large degree, the premiums and/or discount(s) appropriate for the standard and premises of value being sought.* * *

Pratt et al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies 303 (3d ed. 1996).

The market approach (comparable companies analysis) is based on comparisons with publicly traded stocks and derives a value based on publicly traded minority shares. Thus, the method

provides a marketable, minority ownership indication of value. Id. at 304. Under this method, a discount from the listed value is typically warranted in order to reflect the lack of marketability of the unlisted stock. Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). If the stock to be valued by the market approach represents a minority interest, no discount for the lack of control is applied because the method reflects a minority interest. If, on the other hand, the stock represents a control interest, a control premium is warranted in order to reflect the increased value over the minority value determined under the market valuation method. Estate of Desmond v. Commissioner, T.C. Memo. 1999-76.

A discounted economic income approach can produce either a control value or a minority value, depending on the assumptions used in determining the economic income projections and the discount rate. Where the method used values the stock as if it were a controlling interest, no control premium is necessary because the control aspect has already been accounted for within the unadjusted value. Pratt, supra at 303-306. "The most common example of economic income projections that would lead to a minority or control value is whether or not owners' compensation is adjusted to reflect value of services rendered." Id. at 304.

> Generally, if the inputs in the valuation model reflect changes that only a control owner would (or could) make (e.g., changed capital structure, reduced owner's compensation, and so on), then the model would be expected to produce a control value. * * *
>
> If the economic income projections merely reflect the continuation of present policies, then the model would be expected to produce a minority value. * * *

Id. at 194-195.

Under a discounted cashflow analysis, a discount rate based on a traditional capital asset pricing model relates to marketable, minority ownership in the investment to be valued. Issues of control and lack of marketability are usually treated separately rather than incorporating them in the discount rate. Id. at 162-163.

If an indication of value is developed on the basis of acquisition data, applying a minority interest discount is usually appropriate when valuing a minority ownership interest. Id. at 305. However, "if the benchmark for the estimated sale price is valuation multiples observed in acquisitions of public companies, data indicate that valuation multiples for acquisitions of private companies tend to be less." Id. at 354.

In this case, the parties relied on expert testimony to establish the fair market value of the trust's 1,226 shares of JPMS as of the moment of decedent's death. The estate offered the expert reports and testimony of George B. Weiksner and Kenneth W. McGraw, and respondent offered the report and testimony of Martin

D. Hanan, to establish the value of the stock.[3] All three experts created earnings models that generally served as the bases of their analyses, and all experts used comparable companies, discounted cashflow, and/or comparable acquisitions analyses. The experts treated their comparable companies analyses as the estimated publicly traded value of the minority interest of JPMS stock to determine an initial value of the company before applying discounts for lack of marketability.

In deriving their earnings models, all the experts made adjustments to JPMS's financial data. Most significant were adjustments (or lack thereof) to Mr. DeJoria's compensation. The estate's experts, Messrs. Weiksner and McGraw, assumed that Mr. DeJoria's compensation would be $12 million in 1990 and $17 million thereafter. Respondent's expert, Mr. Hanan, created three models. The initial model assumed that a 49-percent shareholder could negotiate a reduction in Mr. DeJoria's compensation to $5 million

---

[3] Respondent also offered the report and testimony of E. James Brennan to evaluate the reasonable level of compensation for services provided by Messrs. Mitchell and DeJoria before Mr. Mitchell's death and to make an estimate of the reasonable level of compensation for Mr. DeJoria for the 5 fiscal years following Mr. Mitchell's death. Mr. Brennan opined that the amounts Messrs. Mitchell and DeJoria paid themselves for the 1984-89 fiscal years were far greater than the maximum amounts paid to comparable top executives at equivalent enterprises for employee services. Mr. Brennan concluded that the maximum level of reasonable compensation for Mr. DeJoria for 1990-94 would range between $820,300 and $1,159,420, on the basis of projections of an increase in sales revenue for those years.

per year.  The second assumed compensation of $2.5 million, and the third assumed compensation of $12 million in 1990 and $17 million thereafter.

Another significant difference in the experts' analyses was the discount rates used by the experts in their discounted cashflow analyses.  Messrs. Hanan and Weiksner determined that JPMS's weighted average cost of capital (WACC) was 15 percent.  Mr. Hanan used the 15 percent WACC as his discount rate.  Mr. Weiksner used discount rates between 17 and 21 percent to take into account JPMS's smaller size.  Mr. McGraw determined JPMS's WACC at 24.7 percent and used a discount rate of 25 percent.  Mr. McGraw attributed 3 percent to JPMS's smaller size and 6 percent to reflect individual risk associated with JPMS.  The individual risk specified by Mr. McGraw was the limited number of prospective purchasers for the stock due to the size of the investment, the minority interest status of the block of stock, and the control exercised by Mr. DeJoria.

The enterprise values (in millions of dollars) determined by the experts under their comparable companies and discounted cashflow analyses are shown in the following table:

|  |  | Enterprise Value | |
|  | DeJoria | Comparable | Discounted |
| Expert | Compensation | Companies | Cashflow |
| Hanan | $2.5 | $302 | $227 |
| Hanan | 5.0 | 272 (267-281) | 218 |
| Hanan | 12.0-17.0 | 193 | 155 |
| Weiksner | 12.0-17.0 | 85-105 | 115-140 |
| McGraw | 12.0-17.0 | 109 | 101 |

Under their comparable companies analyses, Messrs. Weiksner and McGraw applied a 45-percent discount to reflect lack of marketability. Mr. McGraw also applied the 45-percent lack of marketability discount in his discounted cashflow analysis; he did not apply a minority interest discount or assert that the value reflected a premium for control. Mr. Weiksner opined that his discounted cashflow analysis produced a control value that demonstrated a 34-percent control premium over the comparable companies value and confirmed his valuation under the comparable companies analysis. Mr. Hanan applied a 30-percent discount for lack of marketability from the value determined under both his comparable companies approach and his discounted cashflow analysis.

Mr. Weiksner applied a 10-percent extraordinary risk discount to JPMS's comparable companies value. This discount accounted for: (1) The approximate cost of replacing Mr. Mitchell's services that was estimated in the projections of JPMS's operating expenses; (2) operational difficulties; (3) dependence on Mr. DeJoria; and (4) difficulty in maintaining future growth.

Mr. Weiksner valued the trust's 49.04-percent interest in JPMS common stock (1,226 shares) at $20,634,000 to $25,489,000, with a midpoint value of $23,062,000.

Mr. McGraw's comparative companies analysis resulted in a $29.5 million value for the 1,226 shares of JPMS common stock. His discounted cashflow analysis resulted in a $27.2 million value for the 1,226 shares of JPMS common stock.

Mr. Hanan determined an $81 million fair market value for the 1,226 shares of JPMS common stock under his comparable companies analysis. Although Mr. Hanan proposed an $81 million fair market value for the 1,226 shares of JPMS common stock, he conceded that because of a likely disagreement between the buyer/seller and Mr. DeJoria over Mr. DeJoria's compensation and the possibility of litigation, the value of the subject stock could be as high as $165.3 million and as low as $57.7 million.

Expert witness reports may help the Court understand an area requiring specialized training, knowledge, or judgment. Snyder v. Commissioner, 93 T.C. at 534. We may be selective in deciding what part of an expert witness's report we will accept. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. 547, 561 (1986). The purpose of expert testimony is to assist the trier of fact to understand evidence that will determine the fact in issue. Laureys v. Commissioner, 92 T.C. 101, 127-129 (1989). An expert has a duty to the Court that

exceeds his duty to his client; the expert is obligated to present data, analysis, and opinion with detached neutrality and without bias. Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990). In the context of valuation cases, experts lose their usefulness (and credibility) when they merely become advocates for the position argued by a party. Laureys v. Commissioner, supra at 129; Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). When an expert displays an unyielding allegiance to the party who is paying his or her bill, we generally will disregard that testimony as untrustworthy. Estate of Halas v. Commissioner, supra; Laureys v. Commissioner, supra.

Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods, Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion, Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.

We have considered all of the testimony before us, as well as the expert witness reports, and have weighed all other relevant

factors.  All of the expert reports in this case are subject to criticism.

Mr. Weiksner describes his discounted cashflow analysis as an estimation of the company's value that "presumes certainty of outcome and control of the company's cash flows."  Consequently, he asserts that the method results in an estimate of value that is substantially higher than the public enterprise value of the company determined under his comparable companies analysis.  Similarly, Mr. Weiksner opines that his comparable acquisitions analysis generates control values that include a significant premium to public values.  In his discounted cashflow and comparable acquisitions analyses, however, Mr. Weiksner assumed Mr. DeJoria's compensation would be $12 million in 1990 and $17 million thereafter.  That assumption clearly presupposes lack of control and shows a minority interest value.  Rather than demonstrating a 34-percent control premium, we find that Mr. Weiksner's discounted cashflow analysis demonstrates the inaccuracy of the comparable companies method of valuing the stock in this case.

Mr. McGraw also set Mr. DeJoria's compensation at $12 million in 1990 and $17 million thereafter.  Mr. McGraw properly did not claim that the value he determined under the discounted cashflow analysis demonstrates a control premium.  In setting his discount rate at 25 percent, however, he attributed 6 percent to the individual risk, described by Mr. McGraw as the limited number of

prospective purchasers for the stock due to the size of the investment, the minority interest status of the block of stock, and the control exercised by Mr. DeJoria.  The individual risk reflects lack of marketability.  We find that increasing the discount rate to reflect this "individual risk" in addition to applying a large separate discount for lack of marketability results in an undervaluation of the stock.

We are of the opinion that here the comparable companies and discounted cashflow methods (which are theoretical valuation methods) are not appropriate.  We did not use them because (1) there were real-world acquisition offers by Minnetonka and Gillette, and (2) the discounted cashflow and comparable companies analyses, as determined by the estate's experts, produced theoretical values for JPMS that were substantially less than these real-world acquisition offers.

While listed market prices are the benchmark in the case of publicly traded stock, recent arm's-length transactions generally are the best evidence of fair market value in the case of unlisted stock.  See Estate of Andrews v. Commissioner, 79 T.C. at 940; Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979); Estate of Branson v. Commissioner, T.C. Memo. 1999-231.

In Estate of Mitchell v. Commissioner, T.C. Memo. 1997-461, we began our analysis by placing a $150 million value on JPMS at the moment immediately prior to Mr. Mitchell's death.  In determining

this value, we considered all the evidence but gave the greatest consideration to Minnetonka's real-world $125 million offer in the fall of 1988 (which Mr. DeJoria found "a little short") and the Gillette offer of $150 million. This value represents the acquisition value of all the nonpublicly traded stock of JPMS.

In Estate of Mitchell v. Commissioner, 250 F.3d at 705, the Court of Appeals stated:

> Acquisition value and publicly traded value are different because acquisition prices involve a premium for the purchase of the entire company in one deal. Such a lumpsum valuation was not taken into account when the minority interest value of the stock was calculated by the experts. In general, the acquisition price is higher, resulting in an inflated tax consequence for the Estate.

In reaching our valuation determination, we were, and are, mindful that, in general, a publicly traded value (determined under the comparable companies analysis) represents a minority, marketable value. Moreover, we were, and are, mindful that acquisition value, if determined by reference to acquisitions of publicly traded companies, reflects a premium over the publicly traded value. It produces a control, marketable value that is greater than the minority, marketable publicly traded value. If the acquisition price of publicly traded companies is used to value a minority interest in a closely held corporation, discounts for both lack of marketability and lack of control would apply.

The real-world acquisition value of $150 million we applied in this case is the acquisition value based on an offer to purchase

all of the stock of JPMS, which is not publicly traded. The acquisition value based on that offer reflects the fact that there is no ready market for shares in JPMS, a closely held corporation. As we pointed out in Estate of Andrews v. Commissioner, 79 T.C. at 953, "even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock." The $150 million acquisition value reflects a control, nonmarketable value. Therefore, a discount for lack of marketability of JPMS stock from the value determined by reference to the offer to purchase the JPMS stock is not appropriate.

Because we used the real-world acquisition (control, nonmarketable) value of $150 million for the entire company, we were not convinced that the combined discounts opined by the experts in their theoretical values are appropriate. Those combined rates would apply an additional separate 30- to 40-percent discount for lack of marketability to a value that reflects that lack of marketability, in effect doubling the discount.

We recognize, however, that there may be some overlap between discounts for a minority interest and for lack of marketability in that lack of control may reduce marketability. Mr. Weiksner applies a larger lack of marketability discount for minority interests than for a controlling interest. In his report, he

opines that a "larger illiquidity and private company discount" always applies to a minority shareholding of stock than to a control shareholding of that same stock because the minority holder does not have the same access to information and ability to create liquidity as a control holder has. In this case, because the acquisition price includes the discount for lack of marketability, we were, and remain, of the opinion that it is more appropriate to account for any lack of marketability attributable to the minority interest in the minority discount we apply, which for lack of a better term we have referred to as the combined discount.

Mr. McGraw, in setting his discount rate under his discounted cashflow analysis, attributed 6 percent to the individual risk, described by him as the limited number of prospective purchasers for the stock due to the size of the investment, the minority interest status of the block of stock, and the control exercised by Mr. DeJoria. Mr. McGraw's individual risk reflects lack of marketability specifically related to decedent's minority interest. We have increased the minority discount by 6 percentage points to reflect this additional lack of marketability.

Mr. Hanan's discounted cashflow analysis setting Mr. DeJoria's compensation at $2.5 million, resulting in a value of $227 million, reflects a control value of the enterprise. His analysis setting Mr. DeJoria's compensation at $12 to $17 million, resulting in an enterprise value of $155 million, reflects lack of control.

Finally, his analysis setting the compensation at $5 million, resulting in an enterprise value of $218 million, reflects some power but less than control. We think that a comparison of those values demonstrates most accurately the difference between the value of control of the company, the value of shares having some power, and the value of shares lacking any control. A comparison of these values supports a minority discount of 29 percent for some power but less than control (155/218 = 0.711) and 32 percent for lack of any control (155/227 = 0.683).

The 49.04-percent interest in JPMS to be valued in this case had significant power. This interest, through the cumulative voting provision, could elect at least one of three directors. (If there were four directors as provided for in the articles of incorporation, decedent's stock could elect two directors, giving decedent's stock power equal to that of Mr. DeJoria). Mr. Weiksner acknowledges in his report that in some cases investors would consider a 49.04-percent shareholding adequate to influence or even control a company but cautions that an investor would have had no assurance of his ability to influence the management or disposition of the company except through cooperative means.

We find that a 29-percent discount for decedent's 49.04-percent shareholding is appropriate to reflect some power but less than control. We also find that here the minority discount should be increased by 6 percentage points (a total of 35 percent) to

reflect the additional lack of marketability attributable to a minority interest.

On the basis of a thorough review of the entire record before us, we believe that we correctly arrived at a 35-percent discount rate that combines the lack of control and any additional lack of marketability attributable to that lack of control that is not reflected in the $150 million control, nonmarketable acquisition value.

The experts generally agreed that the most significant factors included the impact of Mr. Mitchell's death on the reputation of the company, the costs of the DeJoria litigation, cashflow patterns, the marketability of the estate's minority (i.e. noncontrolling) interest of stock in the company, and the overall competition in the hair care industry. The $150 million acquisition price reflects the cashflow patterns and the overall competition in the hair care industry. We apply a 10-percent discount to the $150 million to reflect the impact of Mr. Mitchell's death on the value of the corporation.[4] We apply a 35-percent discount for lack of control and additional lack of marketability attributable to the minority interest. Finally, we reduce the value of the 49.04-percent ownership interest by $1,500,000 to account for the possibility of litigation with Mr.

---

[4] This 10-percent discount is consistent with Mr. Weiksner's extraordinary risk discount.

DeJoria.  Thus, we find that the value of the shares of stock at the moment of decedent's death was $41,532,600.

We calculated this amount as follows:

| | |
|---|---:|
| Value of JPMS at the moment immediately prior to Mr. Mitchell's death | $150,000,000 |
| Less:  Discount to reflect the loss of Mr. Mitchell to JPMS | (15,000,000) |
| Value of JPMS at the moment of Mr. Mitchell's death | 135,000,000 |
| Percent of trust's interest in JPMS | x    49.04 |
| Value of trust's interest in JPMS before discounts | 66,204,000 |
| Discount for lack of marketability and minority interest (35%) | (23,171,400) |
| | 43,032,600 |
| Discount for possibility of lawsuit | (1,500,000) |
| Value of trust's interest in JPMS after discounts | 41,532,600 |

To reflect the foregoing,

Decision will be entered as previously entered on January 5, 1999.